EDINBURG IRR. CO. et al. v. LEDBETTER et al.   (No. 510-3944.)

(Commission of Appeals of Texas, Section A. June 9, 1926.)

**1. Waters and water courses ⬤⇒232.**

Irrigation company, chartered to furnish water to persons entitled and authorized to appropriate water, had no powers save those given expressly or by plain implications.

**2. Waters and water courses ⬤⇒232.**

Mere grant of franchises and property rights to irrigation company does not authorize use of things granted to bring injury to some that others may be enriched.

**3. Equity ⬤⇒1.**

Equity may not enforce that which is forbidden by law.

**4. Waters and water courses ⬤⇒254.**

Contracts with irrigation company for water rights superior and prior to existent or future rights of other owners *held* discriminatory and of no legal effect.

**5. Waters and water courses ⬤⇒232—Decree of sale of irrigation company canceling water contracts held to cancel discriminatory water contract.**

Decree of sale of irrigation company abrogating, canceling, and annulling all water contracts, rights, easements, and franchises, theretofore entered into by any parties, with exception of certain enumerated rights, *held* to cancel and annul water contract providing for superior and prior rights than those of other owners of adjoining or contiguous lands when not contained among exceptions.

**6. Appeal and error ⬤⇒916(2)—Answer of party in receivership proceeding ancillary to foreclosure of mortgage will be presumed to have aided court's jurisdiction to extent needed in determining effect of decree in collateral attack in later suit to enforce water rights.**

Where persons having water rights appeared and answered in receivership proceeding ancillary to foreclosing of mortgage, although nature of pleading was not disclosed, it must be presumed to have aided court's jurisdiction to whatever extent needed as applied in collateral attack on decree in later suit to establish water rights, since such decree must be deemed valid, unless it appears that no facts could have been shown which would render it so.

**7. Waters and water courses ⬤⇒232—Petition for foreclosure of first lien on irrigation company held to tender issue for determination of rights of parties under water contracts.**

Petition setting out first lien on irrigation company and praying for its foreclosure *held* such as to have tendered issue relative to rights of holders of water contracts, so that such persons, after coming within jurisdiction of court, thereafter so remained for purpose of passing on rights under contract.

**8. Constitutional law ⬤⇒48.**

Court does not have authority to destroy rights which law affirmatively decrees, and it will not be assumed that an ineffectual attempt was made.

**9. Waters and water courses ⬤⇒232 — Water rights of owners of adjoining or contiguous lands are easements not destroyed by decree of sale of irrigation company (Rev. St. 1925, arts. 7492–7517, 7552, 7553).**

Under Rev. St. 1925, art. 7552, authorizing chartering of irrigation companies, and articles 7493, 7508, 7515, 7553, owners of land adjoining and contiguous to dam, reservoir, canal,

ditch, flume, or lateral are entitled to water .rights as determined by corporation and board of water engineers in compliance with articles 7492–7517, and such rights are easements to land which are not destroyed by decree of sale of irrigation company.

**10. Waters and water courses ⚌254—Adjoining or contiguous lands have easement giving right to water, irrespective of contract between irrigation company and landowner (Rev. St. 1925, arts. 7555, 7559).**

Under Rev. St. 1925, art. 7559, all lands adjoining or contiguous to irrigation, canal, ditch, dam, or reservoir within meaning of article 7555 have easement giving them right to water, and existing without regard to contract between irrigation company and landowner.

**11. Waters and water courses ⚌254—Owners of land entitled to water by reason of situation of lands have water right conditioned and restricted according to needs of contiguous and adjoining owners (Rev. St. 1925, arts. 7493, 7508, 7515, 7552, 7555).**

Owners of land not adjoining or contiguous to canal, reservoir, dam, or ditch, within meaning of Rev. St. 1925, art. 7555, but having water right under article 7552 by reason of situation of their lands in area to be irrigated with appropriated water under articles 7493, 7508, 7515, have water rights conditioned and restricted according to needs of owners of land adjoining or contiguous to water facilities.

**12. Waters and water courses ⚌254—When contracts have been entered into, or when contracts have been wrongfully declined by irrigation company, statute requiring equal distribution in times of drought operates (Rev. St. 1925, arts. 7493, 7508, 7515, 7557).**

When irrigating contracts have been entered into with contiguous and adjoining owners, and with owners of rights not adjoining or contiguous, under Rev. St. 1925, arts. 7493, 7508, 7515, or contracts to such persons have been wrongfully declined by irrigating company, article 7557, requiring equal distribution of water in times of drought, operates equally in favor of or against persons of both groups.

**13. Waters and water courses ⚌247(1).**

Judgment undertaking to establish and enforce discriminatory features of irrigating contract which would operate in perpetuam as unlawful priority as between those similarly situated in purview of law *held* unwarranted.

**14. Waters and water courses ⚌254.**

Irrigation company may not contract with owners of lands not adjoining or contiguous so extensively as to prevent adequate supply for all users under Rev. St. 1925, art. 7557, and such contracts in respect to lands controlled by company will be subordinate to rights of owners of adjoining or contiguous lands to receive adequate supply of water.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Suit by A. Ledbetter and others against the Edinburg Irrigation Company, J. W. Hoit, and others, wherein defendant last named filed a cross-action. Judgment granting partial relief was affirmed in part and remanded in part by the Court of Civil Appeals (247 S. W. 335), and the Edinburg Irrigation Company and others bring error. Affirmed in part, and in part reversed and remanded.

Kennerly, Lee & Hill, George A. Hill, Jr., and Richard T. Fleming, all of Houston, for plaintiff in error Edinburg Irr. Co.

George P. Brown, of Edinburg, and Don A. Bliss, of San Antonio, for defendants in error.

Seabury, George & Taylor, of Brownsville, and Roy D. Buckley, of Mission, for Hoit.

Leroy G. Denman, of San Antonio, for American Nat. Ins. Co. and San Antonio Loan & Trust Co.

F. G. Moffett, of Mercedes, for Hidalgo Land Co.

NICKELS, J. The case, as tried and as disposed of by the honorable Court of Civil Appeals, involved numerous issues as between various groups of the 132 parties plaintiff on the one hand, and some one or more of the eight parties defendant. After the writ of error was allowed, the controversies between all of the parties, except J. W. Hoit (who was an original defendant, but who sought relief against his codefendants by cross-action) and Edinburg Irrigation Company, W. E. Stewart, Stewart Farm Mortgage Company, W. E. Stewart Land Company, and Hidalgo Land Company, were settled by agreement. Various questions have been suggested as relevant to the issues which have been left in the case. They have all been considered, but only those of controlling importance will be discussed.

The transcript includes 612 pages, and the statement of facts is made up of 1,338 pages. This volume for the record, especially in view of the elimination of many original issues, precludes anything like a full statement of the case either from the standpoint of the pleadings or that of the evidence. The things which are deemed relevant and material will be stated in the course of the opinion.

In our opinion, whatever rights J. W. Hoit (and those for whom he acts) have in respect to water supply are governable by matters extrinsic the contracts of November 1, 1913, and October 27, 1919.

The material part of the agreement first mentioned is that wherein the La Lomita Irrigation & Construction Company undertook, in perpetuam, to vest in Hoit (then present owner) and in his successors in title the right to have water supplied to the so-called "Young lands" superior and prior to the existent or future right of other owners of lands "adjoining or contiguous to" the company's watering facilities; that is to say, in times of need, drought, and shortgage the "Young lands" should receive the entire wa-

---

⚌For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ter-supply, if that should be necessary for proper cultivation, or, if the entire supply should not be thus required, the "Young lands" should have all that was desired, leaving only the remainder (without reference to its adequacy) to be supplied for other lands. A matter of secondary importance is embraced in those terms of the contract which declared existence of a "permanent water right" in respect to the "Young lands." That contract, as evidence of rights, is out of the way for reasons next stated.

[1-4] The irrigation company, although its entire stock was owned by Hoit and Franke and wife (who directly or indirectly owned the "Young lands"), was quasi public in character, and was endowed with eminent domain privileges. Its chartered purpose was the construction and operation of facilities whereby water might be furnished "to all persons entitled," and because of its public utility aspects it was, by the state, given the right to take and exclusively appropriate water which theretofore belonged to the common fund. It had no power or right save what was given by the state in expressed terms or by implications too plain to be doubted. Railway Co. v. Morris, 67 Tex. 692, 699, 4 S. W. 156; Irrigation Co. v. Vivian, 74 Tex. 173, 11 S. W. 1078; Fertilizing Co. v. Hyde Park, 97 U. S. 659, 666, 24 L. Ed. 1036. The corporation belonged to that class from whose members general law and public policy take the power of making or performing a contract whose terms, if carried out, would inevitably result in undue discrimination. Raywood Co. v. Erp & Wright, 105 Tex. 161, 167, 146 S. W. 155; Borden v. Trespalacios Rice & Irrigation Co., 98 Tex. 494, 86 S. W. 11, 107 Am. St. Rep. 640; Imperial Irrigation Co. v. Jayne, 104 Tex. 395, 405, 138 S. W. 575, Ann. Cas. 1914B, 322; G., C. & S. F. Ry. Co. v. Morris, 67 Tex. 699, 4 S. W. 156. A mere grant of franchises and property rights such as are given these corporations does not in terms or by deduction include the privilege of so using the things granted by the state as to bring injury to some of its citizens in order that others may be enriched. There would be reason for doubting authority of the Legislature to make such grants, if attempted in expressed declaration, and it is most certain that a legislative effort to do that thing may not be implied from the mere use of general terms to delegate the power to be and to act as an irrigation corporation, and, as such, to take by exclusive appropriation waters which otherwise would remain common property. In this respect, whatever implications may be drawn are against existence of the power to discriminate, if, indeed, that power be not denied (as we think it is denied) in the words of the statute. In the legal sense, and despite the actualities, this lack of power was contemplated by the parties when the contracts of November 1, 1913 (and the other one upon which Mr. Hoit re-

lies as confirmatory of his so-called priorities), were made, and what they manually injected into the evidence of those agreements as to priorities the law took out. Equity may not enforce that which is thus forbidden. And the contracts were, in legal effect, as if no attempt had been made to give the "Young lands" the preferences claimed. Raywood Co. v. Erp & Wright, supra.

Except as evidence of Mr. Hoit's right to preference and of the correlative duty of the corporation to discriminate, the 1919 contract is not material, and there is no occasion to give it further consideration.

The lawful provisions of the 1913 contract were terminated, we think, by the decrees, and sale under the decrees, in cause No. 3073, styled American National Insurance Company et al. v. Valley Reservoir & Canal Company et al., in the district court of Cameron county. The discriminatory terms already mentioned pro forma encountered the same fate, and that would have been their end in reality if they had ever (in an effective way) gotten into the contract. Plaintiff in error tendered that former suit, its decrees and sales, as adverse res judicata of whatever rights Hoit et al. obtained under the contract along with the defense that his cross-action and prayers for relief amount to a collateral attack upon the judgment and decrees of the Cameron county court. Mr. Hoit takes the positions, first, that the decrees mentioned are not rightly subject to an interpretation which would make them embrace the present subject-matter; and, second, that the decrees are void (and therefore subject to collateral attack) for lack of pleading essential for their support, if they be held inclusive of this matter. The reasons which impelled our conclusion will now be stated.

Section 94 of the decree entered on July 7, 1917 (called the "final decree"), reproduced, in substantial part, in the opinion of the Court of Civil Appeals, literally "abrogated, canceled and annulled" all "water contracts, water rights, easements, and franchises" theretofore "entered into by any of said parties," except "said water contract and deeds of the defendant Louisiana-Rio Grande Canal Company." By additional clauses that paragraph, in words, declared that "the purchasers at the sales made in accordance with this decree" shall "take the property or properties purchased free from all claims, liens, charges, easements, or franchises of any of the parties hereto, and free from any and all such liens, claims, franchises, charges, or easements of any water contract or deed conveying a water right heretofore entered into by any of the parties hereto, except said Louisiana-Rio Grande Canal Company's water contracts and deeds." The properties which were thus ordered to be sold included every facility and asset owned by the La Lomita Irrigation & Construction Company as well as those owned by the Valley Reser-

voir & Canal Company (another Texas irrigation corporation with which the first-named company had formed a merger of physical properties immediately subsequent to the making of the contract above mentioned). J. W. Hoit was a party defendant in the cause, and, of course, a party to the decree, and in the trial he appeared in person and by attorney. That he was amongst "said parties" whose "water-contracts," "water rights," and "easements" were being dealt with is the plain declaration of the substantive part of the decree, and that fact is made clearer, if a thing which is already clear may be made plainer, by the excepting clause wherein the "defendant Louisiana-Rio Grande Canal Company" and its "water contracts and deeds" are expressly excluded. Nowhere in the decree was Mr. Hoit adjudged to have any rights, and a general clause "in all things overruled" and denied any and all relief "prayed for by any of the parties hereto, of whatsoever nature," except where otherwise "herein specifically disposed of." The relief sought in the plaintiffs' petition included a requirement that each and every party set up and have adjudicated whatever rights he might have or claim in respect to the properties or any part thereof, or else be "forever debarred" under such decrees as might be entered. Whether or not Mr. Hoit actually pleaded his rights as he then conceived them is not disclosed by the present record—and this will be noticed in a later connection—but the presumption which arises upon this nondisclosure tends to confirm, rather than to disavow, an inclusive nature for the decretals noted as well as for those yet to be mentioned.

Pursuant to the decree of July 7, 1917, sales of all of the irrigation facilities (i. e., the physical properties which might be used to supply water to Mr. Hoit or to any other landowner) were negotiated, and this was duly reported to the court with a prayer for notice, hearing, and order of confirmation. Hearing was had July 2, 1919, and on that day the order, as prayed, was entered. Its recitals show notice and the personal appearance of Mr. Hoit as well as his representation by counsel, and its decretals include a confirmation of the sale (and a direction to the receivers to convey the properties), free of all right, title, claim, or interest of any and all parties to the suit (except certain of the plaintiffs). Conveyances, accordingly, were made; Edinburg Irrigation Company, a corporation, subsequently acquiring that title. There was no appeal from either of the decrees, and the later one recites "agreement" and "approval" of "the parties" other than Hammond and Fernandez, together with "evidence of value" as being amongst the reasons for the confirmation.

[5] The language used by the court, it seems to us, appropriately states the intent to "abrogate, cancel, and annul" Mr. Hoit's "water contract" and the rights pertaining thereunto along with others. He was a party, and appeared and was represented as such, and there would seem to be no reason why the court did not have power thus to dispose of the matter. McHenry v. Bankers' Trust Co. (Tex. Civ. App.) 206 S. W. 560; Mudge v. Hughes (Tex. Civ. App.) 212 S. W. 819. The language used, therefore, comports with a proper use and concept of the relevant function of its author. This harmony of word, power, and purpose would appear to have emphasis in the nature and objects of the suit as disclosed by the issues made in pleading and to be mentioned in the discussion of the alternative position assumed by Mr. Hoit.

In 1916 the irrigation companies to which reference has been made (and whose physical properties had, as stated, been somewhat merged in 1913) were indebted to an aggregate extent of more than $1,000,000. Of the outstanding debts the American National Insurance Company owned (about) $250,000, evidenced by notes and secured by purported first liens on the physical properties, and the San Antonio Loan & Trust Company owned (about) $260,000, evidenced (to the extent of about $106,000) by notes executed by Closner and Sprague in favor of Mr. Hoit (in 1913), and in turn transferred to the Loan & Trust Company, and by notes (to the extent of about $156,000) executed directly to the Loan & Trust Company by the two irrigation companies. The debt evidenced by the notes which were transferred to the Loan & Trust Company were secured by first liens (in the form of "vendor's liens" and also, deeds in trust) against the physical properties of the La Lomita Irrigation & Construction Company. The notes evidencing the balance of the debt owned by the Loan & Trust Company were, in substantial part, of the same series by which the American National Insurance Company's debts were evidenced, and all of them were commonly secured. The notes and deeds in trust provided for accelerated maturity of principal upon default of interest payments. Large amounts of unpaid interest had accrued, and the two companies which owned the debts named matured all of the principal, and brought suit against the two irrigation companies and others who had become obligors to recover the same with foreclosure of the liens. The liens were alleged to be first and superior in character, and their foreclosure, as such, was prayed. The financial and other practical difficulties into which the two irrigation companies had fallen were detailed at great length for the purpose of showing that the companies had become disabled so as to make the discharge of their corporate duties to creditors and landowners impossible, and so as to make hopeless insolvency inevitable with serious consequent impairment of the securities and injuries to the members of the public who

were compelled to rely upon the irrigation facilities. A case for "marshaling of assets" and for temporary administration through receivership was sufficiently alleged by the plaintiffs. The appointment of receivers was prayed, and this relief was granted upon presentation of the petition in July, 1916. The receivers qualified, took charge of all of the properties, and held and operated them per directions given. In the course of that administration "receivers certificates" in substantial amounts were issued and sold, and the proceeds used for the benefit of the properties. Thereafter plaintiffs filed an amended petition in which many (additional) persons (including Mr. Hoit) and corporations were named as defendants, with the prayer that all of them be required to set up and have adjudicated whatever rights (of any character) they claimed to have in respect to any of the properties or in respect to any of the original parties or, else, be forever "debarred." Necessity for continuance of the receivership was alleged, and requirement of ultimate sale through the receivers was foreshadowed, and in that connection facts were detailed which would plainly indicate that the properties would have to be sold, as divested of all other incumbering charges, if proceeds sufficient to discharge the first-lien debts, or any considerable part thereof, were to be anticipated. In response to that pleading, Mr. Hoit appeared, and thereafter at all stages of the proceedings appeared in person and by attorney, but, as stated in another connection above, what answer or other pleading he filed is not more definitely shown.

[6] Certain presumptions favorable to the former judgment arise in connection with the present nondisclosure of the nature of Mr. Hoit's pleading. If it be conceded, arguendo, that the averments of the plaintiffs did not, of necessity, put his rights (as pertaining to the contract) in issue, still the essential facts and conditions, if previously lacking, might well have been supplied by his own pleading. Pope v. K. C., M. & O. Ry. Co., 109 Tex. 311, 322, 207 S. W. 514, and cases there cited. That he filed something we know, for he appeared and answered, and the fidelity of recitals (in the decrees) showing that are not questioned. It results that he must be presumed to have aided the court's jurisdiction to whatever extent may have been needed, for, on a collateral attack such as this, the "judgment or decree * * * called in question * * * must be deemed valid unless it appears that no facts could have been shown which would render it so." Martin v. Robinson, 67 Tex. 368, 379, 3 S. W. 550, 555. In this instance, the presumption cannot be harsh, for Mr. Hoit had been thoroughly warned by the expressed declarations of the petition that he might be "debarred," unless he did set up and litigate his rights. That he did so, or that he treated them as being already in issue, is the natural infer-

ence. Scott v. Nat. Bank, 97 Tex. 31, 75 S. W. 7, 10, 104 Am. St. Rep. 835.

[7] But, in our opinion, the petition itself tendered the issue, and, when Mr. Hoit became a party, the matter of his contract was within the jurisdiction of the court, and thereafter so remained. The allegations of a first lien, superior to the rights of all other persons, and the prayer for its foreclosure in that character, necessarily raised the question of whether his incumbrance of the properties was of a lower degree and subject to be cut off in favor of the plaintiffs' securities and the receivers' certificates. The general nature of the suit, as cast by the petition itself, was such as that Mr. Hoit's contract rights as to the properties in custodia legis might be passed (after he became a party), unless expressly reserved, by a receivers' sale (Scott v. Bank, supra), or that the property might be ordered sold free of his claims.

[8] For the reasons stated, there exists res judicata adverse to Mr. Hoit in respect to the 1913 contract. Nevertheless, he, and those for whom he acts, have "water rights" which exist and are independent of the contract, and which were not, and could not have been, destroyed by the former judgment. The consensual "rights" involved in that litigation did not attach to or run with the property itself. Those which we now have in mind are such as, perforce statutory declaration and the public utility nature of the irrigation system, have become "easements to the land," and this affords a sufficient reason for the view of their nonadjudication in the former suit. The court did not have authority to destroy that which the law affirmatively decrees, and it may not be assumed that an ineffectual attempt was made.

[9] The statute which authorizes the chartering of irrigation companies declares the corporate purpose to be that "of conserving, storing, conducting and transferring water to all persons entitled to the use of the same for irrigation," etc. Article 7552, R. S. 1925. As to the identity of the "persons entitled to the use," the statute is not very definite; but from its terms, and by reference to data which must exist, those "persons" may accurately be determined, it is believed, in any given case. As a class, they are generally indicated by those portions of articles 7493, 7508, and 7515, which provide for a public statement of "the purpose" of the appropriation of waters and a "description of the location and the area of the land to be irrigated" with the appropriated water, and by the grant of contractual power as made in article 7553. The large class thus defined includes, of course, all those who belong to it at any specified time, even though some of them may not have theretofore been members. Hildreth v. Montecito Creek Water Co., 139 Cal. 22, 72 P. 395; 40 Cyc. 829, 830. Before a question as to who is "entitled," within the meaning of article 7552, can arise

in respect to any irrigation system, the corporation and the board of water engineers will have previously made public records of maps, profiles, etc., in compliance with the requirements of articles 7492–7517, R. S. 1923, which will indicate the lands whose owners may demand portions of the water appropriated from the common source. See Borden v. Trespalacios Rice & Irrigation Co., supra. The general class, thus provided for, is subject to that subclassification which will segregate all those under "like conditions" into one group, and all those under other "like conditions" into another group, etc., and there may be a difference, very material in periods of water shortage, between the rights of those belonging to the one group as compared with the rights belonging to those of the other. How far that classification may proceed ultimately is not involved here, and ought not to be decided until its decision becomes necessary; but a partial classification is now involved in the application of other statutory provisions. For it is manifest that there may be in the general class mentioned in article 7552 one group, each of whose members "owns or holds a possessory right or title to land adjoining or contiguous to a dam, reservoir, canal, ditch, flume, or lateral" (belonging to the irrigation system), and another group whose lands are not thus "adjoining or contiguous."

[10] As to all lands which are "adjoining or contiguous" within the meaning of article 7555, the statute provides that the "possessory" owner's right to have water is an "easement" which shall "pass with the title." In our opinion the right thus denominated an "easement" exists without regard to a contract between the irrigation company and the landowner, for it is declared (in article 7559) that the owner of "adjoining or contiguous" land "shall be entitled to the use of the water upon the terms provided in his or their contract, * * * or, in case no contract is entered into, then at just and reasonable prices and without discrimination." Other terms of the statute plainly mean that no contract rate or provision may be exacted if it be unjust or unreasonable or discriminatory. Hence each owner of "adjoining or contiguous land," with or without a special contract, is entitled, as a matter of statutory right, to demand and receive water upon reasonable and nondiscriminatory terms. A contract provision which purports evidence of the right is merely brutum pactum, and to that extent the question of whether the former judgment cut off the 1913 stipulations is, in reality, of no practical importance. That right, as stated, is by article 7559 made an easement appurtenant to the estate. The general rule, which must be assumed to have been within the view of the legislature, is that such an easement is appurtenant, also, to every part of the estate, "no matter into how many parts it may be subdivided." 14 Cyc. 1190, 1191, E. And since, obviously, the right attaches to the land of that class at the time of the original construction of the dam, reservoir, canal, ditch, flume, or lateral, it becomes appurtenant to all of the lands which, as then owned as entities, are "adjoining or contiguous." Under the facts exhibited by this record, therefore, the 8,000 acres, called the "Young lands," and in respect to which Mr. Hoit defended and (by cross-action) sued, became indued with the easement, and so remained despite whatever partitions or divisions were thereafter (or may yet be) made. This easement, as stated, is not affected by the former judgment, because it became a part of the land itself by operation of law and independent of the contract which was there terminated. Mr. Hoit and those for whom he acts, and those who are (or may become) his vendees, in respect to the whole and every part of that 8,000 acres, and together with all others who may own "possessory rights" in lands comparably situated, make up a group of "persons entitled" (article 7552) to be served at fair and reasonable charges, and without discrimination perforce of statute, and (even) without any special contracts with the irrigation company. There is, it must be confessed, some apparent ambiguity produced by the terms of article 7559 as compared with words to be found in other articles (e. g., 7556) susceptible of the meaning that, where a special contract has not been made, the owner of "adjoining or contiguous" land may exert his demands only in respect to whatever volume of water remains after deducting the aggregate amount previously "contracted"; but, in view of the plain declaration of an appurtenant easement character (unconditionally enforceable) for the right as made in article 7559, the general purposes of the statute, and the immemorial policy against discriminatory practices by public utility corporations, we have, as indicated, determined that ambiguity in favor of the landowner. That cannot be an easement appurtenant to, and a part of, the land itself whose enjoyment may be precluded (as it might be under a different construction of the statute) by conduct intimate to the owner of the servient estate and those not owning the dominant one.

[11, 12] The other group of "persons" (article 7552), i. e. those whose lands are not "adjoining or contiguous" (article 7555), have the enforceable right to be served under certain conditions. By reason of the situation of their lands in "area * * * to be irrigated" with the appropriated water (articles 7493, 7509, 7515), they may demand a contract with the corporation for water to be furnished at fair and reasonable charges (and to have water furnished at such "charges," if the company declines to contract), if the extent of the facilities then in existence (or to be immediately created) be such as to

enable the company, in ordinary conditions, to discharge its duty to those owning (or having "possessory rights" to) "adjoining or contiguous" lands, and, also, to furnish the water applied for. The rights of this group of persons must be so conditioned, and in our opinion they are so restricted, because, else, the corporation is empowered, ab initio and at any time, purposely, arbitrarily, or negligently to divest itself of the means requisite for the performance of the duty (made absolute by statute) owed to members of the other group. Upon the assumption that these corporations will endeavor the good faith performance of all their duties, the Legislature, in this way, left some discretion to them in relation to the question of whether they will, or will not, in a given case, contract with a person who is not the owner of "adjoining or contiguous" land. If good faith be present (and this, of course, implies existence of reasonable grounds in fact), and undue discrimination be absent, it seems to us that the company has the right to refuse to contract in such a case, if, reasonably viewed, the extent of the facilities available is not such, in its judgment, as will enable it to perform the duties owed to "persons" of the first-described group and the new applicant also. In the event of a declination, so circumstanced, the applicant would not have the right to water. But when contracts have been so entered into with persons of the second group (or contracts with them have been wrongfully declined), and the discretion thus vested in the company has been exercised (or wrongfully nonused), other provisions of the statute operate equally in favor of or against the "persons" of both groups.

For article 7557 declares an obligation, commonly owed, in these words:

"In case of shortage of water from drouth, accident or other cause, all waters to be distributed shall be divided among all customers pro rata, according to the amount he or they may be entitled to, to the end that all shall suffer alike, and preference be given none."

The language thus selected and employed by the Legislature, and in harmony with other relevant provisions and the quasi-public aspects of the situation, imports an absolute requirement of nondiscriminatory service of water, in times of shortage, and it is in contemplation of such periods that most cases, such as this one, will arise.

An application of the views as expressed to the relevant portions of the judgment under review will indicate more precisely the rights of Mr. Hoit, those for whom he acts and his vendees (present or future), and of the (present) adverse parties, as well as the disposition that ought to be made of the case.

[13] In that portion of the judgment there denominated "second," "the permanent water rights claimed and asserted by the said J. W. Hoit * * * under and by virtue of "the contract of November 1, 1913 (already mentioned above), are adjudged to be established, as claimed, in perpetuity, and as against all parties to the suit (with immaterial exceptions). In subparagraph "1" of that portion of the judgment entitled "third" the irrigation company (plaintiff in error) is "forever enjoined" from "questioning or denying the permanent water rights" as established in subdivision "second." In other paragraphs (viz. 4, 5, and 6) of subdivision "third," the irrigation company is enjoined from "failing or refusing" to furnish water sufficient for the "proper irrigation" of the lands represented by Hoit, from failing or refusing to issue to Hoit (or his vendees) "water contracts" affirmatively stipulating that the "water rights," as claimed under the 1913 "contract," and as established in preceding portions of the judgment, are, in perpetuity, appurtenant to the lands named, and from "failing and refusing" to do any act or thing "necessary to the full enjoyment" of the "water right" as claimed under the 1913 "contract" and as previously decreed: and in paragraph 6 of subdivision "third" it is "affirmatively commanded to do, and cause to be done, each and all of the acts and things which it has hereinbefore been enjoined and restrained from failing and refusing to do." These portions of the judgment, of course, undertake to establish and enforce the unduly discriminatory features of the 1913 "contracts," along with its other features, and, if allowed to stand, will operate in perpetuam as an unlawful priority as between those who may be similarly situated in purview of law. This aspect of the matter is necessarily involved, and because of it, as well as because the 1913 "contract" was ended by the former judgment, those portions of the judgment, and others which may relate thereto, are without warrant in law or equity.

In paragraphs 3, 4 and 5 of that portion of the judgment entitled "fourth," and in subdivision "fifth," the irrigation company is enjoined from issuing any water contract "to any lands not now covered by water contracts" issued by it, except the Hoit lands, or any uncultivated lands to which "water has not been heretofore furnished," and from furnishing any water "for the irrigation of any lands owned by the Edinburg Irrigation Company itself or by the Stewart Farm Mortgage Company or by W. E. Stewart," or the W. E. Stewart Land Company or their vendees. The lands thus proscribed aggregate several thousand acres. The record indicates that some of them are "adjoining or contiguous" within the meaning of articles 7555, 7559, and that others of them are not such, but are, nevertheless, within the "area * *. * to be irrigated," as that designation has been used by us, and that still others of them may lie outside the "area," but it is wholly insufficient to enable allocation of

them as between the various classes. As to those which may be "adjoining or contiguous," at least, the company owes a statutory duty equal to that owed to Mr. Hoit et al. It may owe a statutory duty in respect to the others, but that question may not be determined, for there is an essential lack of evidence. Those portions of the judgment, therefore, in part at least, operate to inhibit the corporation from proper exercise of the franchise upon whose promised user the state relied in granting corporate existence and the right to make exclusive appropriations of public waters. Besides, it is plain, these provisions were incorporated in the judgment in aid of, and relative to, those which undertake to establish and enforce an unlawful preference in behalf of the Hoit lands. And, prima facie, they impress upon some of the proscribed lands that discrimination which the statute itself denounces. Consequently, they are erroneous.

Mr. Hoit, or his vendees, are entitled to demand and receive of the company water contracts embodying fair, reasonable, and nondiscriminatory terms as to charges, quantities, and conditions, or, in the absence of a contract of that import, he and they are entitled to receive water on like terms, charges, and conditions, and either or both of those rights may be enforced in the manner and to the extent shown proper by the evidence upon a new trial. The rights of those whose lands are "adjoining or contiguous," as that term has been used, may likewise be established and enforced without further question. But as to those lands owned or controlled by the company itself, or by W. E. Stewart, the Stewart Farm Mortgage Company, or W. E. Stewart Land Company, and which are not "adjoining or contiguous," there is, as we see the matter, issues of fact which must be retried, and those issues will now be more particularly mentioned.

[14] The element of good faith already mentioned in the discussion of that discretion with which an irrigation company is vested in making contracts, or in furnishing water, to its "customers" who do not own "possessory" rights to "adjoining or contiguous" lands precludes injury to owners of lands of the first class, in times of shortage, through the purposed device of contracting with owners of the second class so extensively as to prevent an adequate supply for all under the requirement of equal distribu-

tion embodied in article 7557. The irrigation company must keep at least two things in mind, viz. (a) its duty to the owners of "adjoining or contiguous" lands, which it owes in any event, and (b) the nature and capacity of the facilities available for the performance of that duty, as well as for the supplying of such additional land as it contemplates at any given time. If it should deliberately incur additional obligations whose performance would likely overtax its facilities, its bad faith could not be doubted, whether the motive be gain or spite. The effect of such contracts made with persons who are not parties to the bad faith and the rights of "adjoining or contiguous" owners as against those contracts are beyond the issues now presented. But, if such contracts were made in respect to lands controlled by the company itself, or by those who controlled it (and who, necessarily, would be participants in the wrong), the rights thus evidenced would be subordinate to the rights of the owners of "adjoining or contiguous" lands to receive, at all times, an adequate supply of water, and owners of the latter class would be entitled to restrain performance of the contracts so far as necessary to prevent injury to themselves. An issue of that kind, as between Mr. Hoit, on the one hand, and the Irrigation Company, W. E. Stewart, Stewart Farm Mortgage Company, and W. E. Stewart Land Company, on the other hand, is tendered in the pleadings. There are here no findings of fact by which it is controlled, and the evidence before us does not, as a matter of law, determine it one way or the other.

We believe that the judgment as to those portions specifically mentioned above should be reversed, that the case should be remanded for trial of the issues pertaining to the statutory rights of Mr. Hoit (and of those for whom he acts) in his capacity as owner of "adjoining or contiguous" lands (which issues, of course, include the one last mentioned above), and that in all other respects the judgment should be affirmed, and we recommend that disposition.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals affirmed in part and reversed in part, as recommended by the Commission of Appeals, and cause remanded to the district court, as recommended by the Commission of Appeals.